J-A27035-24                    2025 PA Super 86

| | | |
|---|---|---|
| ANIMAL LEGAL DEFENSE FUND | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FOSTER POULTRY FARMS, A | : | No. 594 MDA 2024 |
| CALIFORNIA CORPORATION | : | |

Appeal from the Order Entered March 28, 2024
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2023-0-1116

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

OPINION BY McLAUGHLIN, J.:                    **FILED APRIL 15, 2025**

Animal Legal Defense Fund ("ALDF") appeals from the order quashing a foreign subpoena compelling Farmers[1] Pride, Inc. ("Farmers Pride") to produce information regarding their poultry manufacturing processes. We affirm.

ALDF is a non-profit involved in the protection of animals. In California, ALDF filed suit against Foster Poultry Farms ("Foster"), a poultry processor and national supplier of poultry products located in California. In that litigation, ALDF alleges Foster uses excessive water in violation of the California Constitution. ALDF claims Foster uses "waterborne electric immobilization stunning" in its slaughter system and chills its carcasses using "water immersion chilling." Trial Court Opinion, filed March 28, 2024, at 2. It maintains that alternative stunning and chilling processes use less water.

---

[1] We have used the spelling that Appellee uses in its brief, that is, without an apostrophe.

ALDF filed a praecipe in the Lebanon County Court of Common Pleas to issue a foreign subpoena to Farmers Pride.[2] Farmers Pride is a poultry processor located in Fredericksburg, Lebanon County, Pennsylvania, with no connection to the California litigation. ALDF asserted that Farmers Pride's website boasts that its new, state-of-the-art facility uses superior slaughtering and chilling processes, which are more humane and require far less water than other methods.

The trial court's prothonotary issued a subpoena in August 2023 requiring Farmers Pride to produce documents and a representative for deposition. The subpoena required documents relating to, and one or more deponents knowledgeable about, all of the following:

1) . . . the type of stunning system(s) at your processing facility.

2) . . . the type of scalding system(s) at your processing facility.

3) . . . the type of inside/outside bird washing system(s) at your processing facility.

4) . . . the type of air chill system(s) at your processing facility.

5) . . . the total annual volume of water used at your processing facility since January 1, 2022.

6) . . . the total annual volume of water used for slaughtering at your processing facility since January 1, 2022.

7) . . . the total annual volume of water used for processing at your processing facility since January 1, 2022.

---

[2] **See** Uniform Interstate Depositions and Discovery Act, 42 Pa.C.S.A. §§ 5331-5337.

8) . . . the total annual volume of water used to operate and clean the stunning system(s) at your processing facility since January 1, 2022.

9) . . . the total annual volume of water used to operate and clean the scalding system(s) at your processing facility since January 1, 2022.

10) . . . the total annual volume of water used to operate and clean the inside/outside bird washing system(s) at your processing facility.

11) . . . the total annual volume of water used to operate and clean the air chill systems) at your processing facility.

12) . . . the total annual volume of water used to operate and clean chicken carcasses at your processing facility.

13) . . . the total annual volume of water used to clean your processing facility since January 1, 2022.

14) . . . the total number of chickens processed annually at your processing facility since January 1, 2022.

15) . . . the total annual number of chicken carcasses condemned as cadavers because they died in the scalding system at your processing facility since January 1, 2022.

16) . . . the total cost of designing, installing, and maintaining the stunning systems at your processing facility.

17) . . . document(s) considered or relied upon for publishing the following assertions in Leading the Charge in Humane Animal Welfare.

a. "Here in the U.S., most chicken producers (then and now) use electrical shock to render chickens unconscious. Common sense tells you that using $CO_2$ gas is more humane. However, traditional CAS is a quick process, and when chickens are deprived of oxygen too quickly, they experience extreme stress and sometimes convulsions. That's not humane and I wanted better for my chickens."

b. "Our SIA system was fully installed in 2011 for 100% of our chickens. It is 10-times slower than traditional CAS. The slow and gradual release of $CO_2$ through a series of long

chambers peacefully puts our chickens to sleep without stress"

18) . . . document(s) considered or relied upon for publishing the following assertion In Your Bell & Evans New Organic-Certified Chicken Harvesting Facility Virtual Tour.

c. "The water savings from our 100% air chill processing makes us 40% more water efficient than the rest of the poultry industry."

*See* Trial Ct. Op., at 5-6 (quoting Ex. 1 to Motion to Quash).

Farmers Pride moved to quash the subpoena. It argued that it sought confidential business information and protected trade secrets and that complying would be unreasonably annoying, burdensome, and expensive. Farmers Pride provided a supporting affidavit from its Senior Vice President of Finance, Daniel Chirico. He stated that Farmers Pride "uses unique production processes and equipment to produce its poultry products" and had invested significantly in those processes and equipment. Aff. of Daniel Chirico at 2, ¶ 7; RR-0293. He further attested that Farmers Pride and Foster sell their products in some of the same markets and Farmers Pride does not share "private information about its production processes" with competitors, including Foster. *Id.* at 2-3, ¶ 9.

He also stated that responding to the subpoena would impose substantial burdens on Farmers Pride. He noted that the subpoena requested data on water use for "discrete phases" of production. He stated, however, that "Farmers Pride does not maintain its water use data on a process-by-process basis or in a format that is conducive to responding to these requests." *Id.* at 3, ¶ 11. He added that it would be "additionally burdensome and

difficult" for Farmers Pride to answer the requests for data about water use because Farmers Pride recycles significant amounts of water. It therefore cannot simply supply the amount of water it draws from wells or other sources. Rather, Farmers Pride would have to engage in "significant additional analysis and investigation" to provide data "that Farmers Pride does not maintain in the usual course of its business." *Id.* at 3, ¶ 12. Compliance with the subpoena, he stated, would thus "impose substantial burdens and costs on Farmers Pride in the form of significant document review, fact gathering and witness preparation." *Id.* at 4, ¶ 13.

The court heard argument on January 5, 2024, and quashed the subpoena. ALDF timely appealed and raises the following issue:

> Did the Court of Common Pleas of Lebanon County, Pennsylvania commit an error of law or an abuse of discretion in quashing the subpoena issued by [ALDF] instead of using the court's discretion to limit the scope of the subpoena to mitigate release of potentially trade secret information when limiting the scope of the subpoena was both within the trial court's discretion and supported by applicable law when addressing discovery in the underlying California litigation?

ALDF's Br. at 2.

ALDF first argues that the court abused its discretion in finding that the information sought by the subpoena constitutes trade secrets. ALDF states that it is not requesting trade secrets, but only general information regarding the types of processes Farmers Pride uses. ALDF contends that most of the information it seeks is in the public domain, such as YouTube advertisements and trade publications, and is well known to employees and others in the

- 5 -

business. ALDF also contends that because water discharge amounts are regulated by the Department of Environmental Protection and the Environmental Protection Agency, they cannot be trade secrets.

ALDF next argues the court abused its discretion when balancing ALDF's need for the information versus the potential harm of disclosure. According to ALDF, the general information it requests is crucial to the underlying litigation, and it is up to Foster to prove it cannot implement the types of processes used by Farmers Pride. ALDF argues the court abused its discretion in finding the discovery process would be burdensome to Farmers Pride, because ALDF has not asked Farmers Pride to create any documents that do not already exist. It also asserts that Foster is not a competitor of Farmers Pride. ALDF further contends the court erred in holding that ALDF should obtain and present any publicly available information through use of a third-party expert. ALDF argues it is entitled to subpoena the source of publicly available information. ALDF argues that any information going to the exact processes that might qualify as trade secrets would be limited by a protective order that was entered by the California court.

ALDF argues that at a minimum, Farmers Pride should be ordered to authenticate its public pronouncements. ALDF argues that otherwise, the publicly available information will be inadmissible as hearsay. ALDF posits the court should have crafted an order to allow it to "seek already existing information about non-trade secret matters and authenticating Farmers Pride's public statements." ALDF's Br. at 21. ALDF asserts the court had an

obligation to draft an order "to facilitate liberal discovery of facts that would lead to admissible evidence." ALDF's Reply Br. at 4.

The discoverability of trade secrets is "uniquely within the discretion of the trial judge," and the court's ruling will not be reversed "unless [it is] deemed to represent an abuse of discretion." ***Rohm & Haas Co. v. Lin***, 992 A.2d 132, 143 (Pa.Super. 2010) (citation omitted). "Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will." ***Carlino E. Brandywine, L.P. v. Brandywine Vill. Assocs.***, 260 A.3d 179, 196 (Pa.Super. 2021).

Rule of Civil Procedure 4012(a)(9) governs protective orders. It allows the court to enter an order as justice requires, upon motion and "for good cause shown," to protect against "unreasonable annoyance, embarrassment, oppression, burden or expense," including the disclosure of a trade secret. Pa.R.Civ.P. 4012(a)(9); ***see also*** 42 Pa.C.S.A. § 5336 (incorporating the Rules of Civil Procedure relating to subpoenas to foreign subpoenas). The court may determine "whether disclosure is to be allowed, if protection is to be afforded, and the form of such protection[.]" ***Crum v. Bridgestone/Firestone N. Am. Tire, LLC***, 907 A.2d 578, 586 (Pa.Super. 2006).

This Court has defined a "trade secret" as

> any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

**Rohm & Haas Co.**, 992 A.2d at 143 n.4 (citation omitted); **see also** Rest. (Second) of Torts § 757, comment b; **Felmlee v. Lockett**, 351 A.2d 273, 277 (Pa. 1976). The court must consider the following factors to determine whether certain information is a trade secret:

1) the extent to which the information is known outside of his business; 2) the extent to which it is known by employees and others involved in his business; 3) the extent of measures taken by him to guard the secrecy of the information; 4) the value of the information to him and to his competitors; 5) the amount of effort or money expended by him in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

**Crum**, 907 A.2d at 585. Once the moving party establishes that the information sought is a trade secret, the burden shifts to the party seeking discovery "to demonstrate that production of the trade secret is relevant and necessary, and that the necessity outweighs the harm of disclosure." **Id.** at 587.

Here, the trial court considered the above factors and found the information requested constituted trade secrets. It first observed that the information sought "could lead to the divulgence of the details of Farmers Pride's equipment and processes":

Nos. 1 through 4 request information on the systems used in each step of production. Nos. 5 through 13 (involving water usage) request information which could lead to the divulgence of the details of Farmers Pride['s] equipment and processes. Nos. 14 and 15 (regarding production and loss figures) request information which is kept confidential by Farmers Pride, the release of which

> could reveal information regarding Farmers Pride's equipment and processes.

Trial Ct. Op. at 13. The court found that although ALDF argues it only requests the "types" of systems utilized, this information "implicates the entire process of manufacturing" and its disclosure could readily reveal trade secrets. *Id.* at 16.

The court noted that "Farmers Pride takes care to protect information regarding its manufacturing process from dissemination to competitors and the general public." *Id.* at 13. The court observed that Farmers Pride claims its processes result in a superior product and that it has not shared information regarding its processes outside of its business. *Id.* The court noted that the public advertisements raised by ALDF "reveal only general information about Farmers Pride operations and do not divulge any specific information regarding the design of its equipment or particulars of the various processes used by Farmers Pride in the manufacture of its products." *Id.* at 13-14.

The court observed that while it is necessary for Farmers Pride's employees to understand the processes they use, "this information is not disclosed to the general public or competitors of Farmers Pride." *Id.* at 14. The court found the fact that Farmers Pride would need to produce multiple employees to explain the various phases of the manufacturing process was indicative "that the entire process is not widely known among all employees." *Id.* at 14-15. The court also noted that "the very reason ALDF" seeks the information from Farmers Pride is because Farmers Pride uses a "unique

process" and ALDF has been unable to obtain information about it elsewhere. *Id.* at 14.

The court next found that the requested information "is of great value and importance to Farmers Pride." *Id.* at 15. It noted that "Farmers Pride claims that its equipment and method of manufacturing are different from its competitors and that its superior products give it a great competitive edge in the premium food market." *Id.* The court found disclosure of this information could deprive Farmers Pride of its edge in the marketplace and cause the possible loss of revenue. *Id.* The court observed that ALDF asserted that "Farmers Pride has expended $360 million dollars in building its new facility which incorporates its unique systems and equipment." *Id.* The court also found that the processes developed by Farmers Pride would be difficult for competitors to duplicate. *See id.* ("ALDF's attempts to obtain this information from Farmers Pride for use in the California litigation indicates the difficulty of the acquisition, duplication or development of this information by persons or entities not connected with Farmers Pride").

After concluding that the requested information consisted of trade secrets, the court considered whether "the information is relevant and necessary" to ALDF's suit, and, if so, "whether the necessity outweighs the harm of disclosure." *Id.* at 16. The court first found that while "the water usage of other chicken processors is relevant in the California litigation," Farmers Pride's information would be of questionable utility to proving Foster over-consumes water.

> Foster Farms indicates that its facility was built in 1959, while Farmers Pride completed its new facility in 2021. Foster Farms notes that Farmers Pride produces organic products while Foster Farms does not. Foster Farms indicates that there is a multitude of differences between the two plants and that it would be unable to implement the processes used by Farmers Pride in its facility.

*Id.* The court also "question[ed] the necessity of the requested information as there are other less intrusive means" to prove Foster could use less water, such as by hiring industry experts or gathering information from the Department of Environmental Resources. *Id.* at 17.

The court next found that producing the requested information would be "overly burdensome and onerous." *Id.* at 17-19. The court explained that Farmers Pride "does not keep records of water usage on a process-by-process basis and that responding to this inquiry would require considerable time, expense and manpower[.]" *Id.* at 17. The court also noted Farmers Pride's hesitancy to divulge information that might expose it to future litigation by the ALDF. *Id.* at 18. The court concluded "the danger of disclosure outweighs any potential benefit to ALDF in light of the competitive edge Farmers Pride would lose if such information is divulged." *Id.*

Finally, the court found that the protective order would not sufficiently protect Farmers Pride's interests. *Id.* at 19. It noted that the information was liable to be leaked, given that any expert ALDF uses in its litigation "would be involved in the business of chicken processing and would likely be involved with one of Farmers Pride's competitors in the future." *Id.* It pointed out that any inadvertently leaked information could make it possible for a competitor

to "duplicate Farmers Pride's designs and method of manufacturing." ***Id.*** at 19, 20.

The court's decision to quash the subpoena was not an abuse of discretion. The court duly considered the requisite factors before determining the requested information was trade secrets. It then properly weighed ALDF's need for the information against the potential harm disclosure would have on Farmer's Pride. ALDF's argument in California – that Foster should implement Farmers Pride's unique water-saving processes – directly contradicts its current argument that disclosure of information regarding those processes would not result in their duplication.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 04/15/2025